Woodfill *et al. v.* Patton *et al.*

No. 7500.

WOODFILL ET AL. *v.* PATTON ET AL.

SPECIAL FINDING.—*Facts.—Intention.—Practice.*—It is the office of a special finding to state the facts, and not the evidence of the facts; and a statement in the finding of the court as to the intention of a testator in making pencil marks across his signature to his will is a statement of a fact. The statement that the fact is inferred from other facts does not make the conclusion any the less "a finding of fact."

WILL.—*Revocation of.*—In order that there should be a valid revocation of a will, there must be the concurrence of the intention to revoke and the act manifesting the intention, and the act must be such as the statute recognizes as a proper manifestation of the intention to revoke.

SAME.—*Mutilation.—Erasure.—Statute Construed.*—Under section 19 of the act in relation to wills, 2 R. S. 1876, p. 570, the erasure by a testator of his signature to a will, designedly and deliberately made, accompanied by the intention to revoke, must be deemed a destruction of the will, and the purposely drawing a pencil, or other implement which

erases, cancels or obliterates, over the signature to a will by the maker, must be deemed to constitute such a mutilation as takes from the instrument an element essential to its validity, and is therefore a revocation thereof.

From the Jefferson Circuit Court.

*C. A. Korbly* and *W. S. Friedley*, for appellants.

*E. R. Wilson* and *J. F. Bellamy*, for appellees.

ELLIOTT, C. J.—Appellants, by their complaint, affirmed that a will executed by Daniel Woodfill had been revoked; this, the appellees by their answers, denied. Upon this issue the case was tried. A special finding of facts was made and conclusions of law stated. The case comes to this court upon the exceptions to the conclusions of law stated by the trial court.

The material facts are substantially these: Daniel Woodfill, then a widower with five children, executed a will on the 2d day of March, 1869, and gave it to his son Clarence for safe-keeping. Clarence then lived with his father, on what was called the home farm, which was by the will of his father devised to him. In February, 1872, the testator married Nancy Woodfill, one of the appellants. About the same time he became desirous of regaining exclusive possession of the home farm, and to accomplish this purpose he conveyed to John G. Woodfill the land which the will devised to three of his daughters, and to induce his son Clarence to surrender possession of the home farm, gave him the sum of one thousand dollars received from John G. Woodfill, for the land conveyed to him. The proposition made to and accepted by Clarence, and the facts occurring thereafter, are thus stated in the special finding. The said Daniel Woodfill "proposed to Clarence, as an inducement for him to surrender the possession and use of said premises, to pay him said one thousand dollars in payment of the notes mentioned in the first item of the will, amounting to $500, and as an advancement of $500 in part payment of his interest

in the estate of his father ; that Clarence accepted said offer, received the sum of $1,000, $500 in payment of said notes, and $500 as an advancement, surrendered the possession of said farm, delivered up said notes to his father, together with said will and the other papers entrusted to him for safe-keeping, and also gave his father a receipt, in these words, to wit :

" 'JEFFERSON COUNTY, INDIANA, Nov. 5th, 1872.

"'Received of Daniel Woodfill the sum of five hundred dollars in part payment of my interest in the estate of my father, Daniel Woodfill.

(Signed)                              "'C. C. WOODFILL.'

"That said transaction took place about November 5th, 1872, and within a day or two afterward said Clarence C. Woodfill removed to the State of Kansas, where he bought land and remained two years ; that, after said Clarence Woodfill had delivered said will to his father and gone from his presence, to wit, on the same day, he (the father) showed the will to his wife, and that his signature thereto was much blackened by a considerable number of parallel and circular lines and some cross-marks made by a common lead pencil, and drawn over and about said signature ; that some of the smaller letters were wholly blackened thereby, but were yet discernible on a close inspection, and the said signature, as a whole, still remained quite perceptible and legible through said pencil marks ; that his name in the attesting clause was in a similar condition, and that said pencil marks were so made by the testator with the intention of revoking said will, which fact is found by the court as an inference from the foregoing facts ; that, after calling the attention of his wife to the condition of his signature thereto, he put said will away with his other papers ; that at his death it was found in the aforesaid condition among his valuable papers, and that among the latter were also found the notes paid to Clarence

and taken up as aforesaid, but that from each of them his signature had been cut off and removed."

Following the finding we have quoted are statements showing the property owned by the testator at the time of his death, in September, 1876; the admission of the will to probate, and showing also the erasure of the pencil marks by the clerk of the circuit court after the will had been probated. The conclusions of law are stated in the following language: "And upon the facts found as aforesaid the court, as conclusions of law, finds that said will was not revoked, and the court, therefore, as a matter of law on said facts, finds for the defendants."

An important question of practice first requires consideration. It is necessary to determine what are the facts stated in the special finding. Appellants affirm that it is found as a fact, that the testator did revoke his will by drawing the pencil lines across his signature. The appellees meet this affirmation by the proposition, that, as they express it, "the court had no authority to conclude the appellees by stating its opinions, conclusions or inferences; and, if in this the court went beyond its province, all such opinions, conclusions or inferences are mere surplusage, and not binding upon the parties." This preliminary contention springs from the clause, "And that said pencil marks were so made by the testator with the intention of revoking said will, which fact is found by the court as an inference of fact from the foregoing facts." Counsel have not referred us to any adjudged cases, but have contented themselves with referring to the provisions of the statute, which reads as follows: "The court shall first state the facts in writing, and then the conclusions of the law upon them." 2 R. S. 1876, p. 174, sec. 341. This provision means, clearly enough, that the facts, and not the evidence, shall be stated. It has been repeatedly held that the facts, and not the evidence, shall be set forth in the special finding. In *Davis* v. *Franklin*, 25 Ind.

407, it was said : ''The statute directs that 'the court shall first state the facts in writing, and then the conclusions of law upon them,' and when the finding attempts to go beyond this limit, and not only state the facts found, but the evidence upon which the finding was based, we must regard the evidence as improperly in the record.'' In *Tousey* v. *Lockwood*, 30 Ind. 153, it was held that the finding should state the facts, and that a statement of the evidence was improper. The late case of *Kealing* v. *Vansickle*, 74 Ind. 529, declares the same general doctrine. In *Locke* v. *The Merchants National Bank*, 66 Ind. 353, it was said of special verdicts, that ''It has often been decided by this court that the jury should not find the evidence, but the facts.''

It is not always easy to discriminate between evidence and facts ; the line of separation is often shadowy and indistinct. We think, however, that the statement in the finding of the court, as to the intention of the testator in making the pencil marks across his signature, is clearly the statement of a fact. Intention is almost always a fact to be inferred from evidence. Facts are occurrences or events ; evidence the means by which the happening and the character of such occurrences or events are shown. It is said in *Locke* v. *The Merchants National Bank, supra,* that there are two kinds of facts—''evidentiary facts and inferential facts ;'' and the fact under immediate mention belongs to the latter class. It is such facts that the finding should set forth. The statement that the fact is inferred from other facts does not make the conclusion any the less ''a finding of fact.'' The only possible way in which a conclusion of fact can be drawn from evidence is by the process of inference.

In order that there should be a valid revocation of a will there must be the concurrence of two things, the intention to revoke, and the act manifesting the intention. There is no question in this case as to the existence of the intention to revoke, for it is expressly found to have existed at the

time the act, which it is contended worked the revocation, was done. The question, therefore, is whether the act was such as manifested and effected the intention in a manner authorized by law. There must not only be an act of revocation, but the act must be such as the statute recognizes as a proper manifestation of the intention to revoke. The act will not operate as a revocation, no matter how strongly and unequivocally it may show an intention to revoke, unless it be such an act as the statute prescribes. Upon this point there is entire harmony. *Runkle* v. *Gates*, 11 Ind. 95; *Woolery* v. *Woolery*, 48 Ind. 523; 1 Jarman Wills (5th Am. ed.) 287, *n.*; 1 Redf. Wills, 306. There is some diversity of opinion as to the proper construction of statutes prescribing methods of revocation, but it is generally agreed that the statutes shall receive a strict construction, and that the case must be brought clearly within their provisions. Our statute upon this subject is as follows: "No will in writing, nor any part thereof, except as in this act provided, shall be revoked, unless the testator or some other person in his presence, and by his direction with intent to revoke, shall destroy, or mutilate the same." 2 R. S. 1876, p.576. The specific acts which, under former statutes and at common law, were essential to a valid revocation, as cancellation, burning and the like, are not required to be shown, although they would doubtless be sufficient under the present statute, if of such a character as to show a mutilation or destruction of the instrument.

It was the rule of the common law prior to the enactment of the statute of 1 Vict. ch. 26, that a deliberate obliteration of the signature operated to revoke the will, if made *animo revocandi*. Since the adoption of that statute, the English courts have held that there must be either a partial or total destruction of the paper or parchment upon which the words of the will are written, or a total obliteration of the words of the instrument. These cases are pressed upon

·our consideration, and we are earnestly asked to adopt them
·as our guides. The language of the English statute is not
at all similar to ours. It is therein enacted that no will,
·codicil or any part thereof shall be revoked in any other
manner than, in designated cases, by operation of law or by
the execution of a new instrument, or "by the burning, tear-
ing, or otherwise destroying the same." Under this statute
it has been held that drawing a pen across the signature, or
by erasing with ink other parts of the instrument will not
·operate as a revocation, if the signature or words can still be
·discerned. In one case the court directed the use of strong
glasses in order to ascertain whether there was a complete
·erasure of the characters used in drafting the will. In other
·cases it is held that nothing short of a destruction by burn-
ing or tearing will be an act of revocation within the statute.
These cases are cited in the recent editions of Jarman on
Wills and Williams on Executors, and we do not deem it
necessary or useful to comment upon them, for the statute
upon which they are based is so radically different from ours
that they can have no bearing upon the question before us.
In *Price* v. *Powell*, 3 H. & N. 340, POLLOCK, C. B., said
that "Very little assistance is to be derived from the previ-
·ous cases in construing the altered expression in the statute,"
·and this we may say of all the English cases based upon the
statute of Victoria.

The destruction of a will did not, at common law, imply
·a ruin of the paper or parchment on which the words were
·written. It meant taking from the instrument force and
·effect. The legal force of a will may be as effectually de-
·stroyed by erasures as by the destruction of the paper upon
which it is written. Neither words nor sentences can have
legal validity in and of themselves; the signature duly
·attested gives force and vitality to the instrument. It is
often said a will speaks from the death of the testator, and
it would be strange indeed, if a paper from which the signa-

ture is designedly taken, either by erasure, obliteration or
by manual tearing, for the very purpose of preventing it
from speaking, should ever be allowed to speak.   We think
the erasure of the testator's signature, designedly and de-
liberately made, accompanied, of course, by the intention
to revoke, must be deemed a destruction of the will.    It is,
not necessary that there should be destruction, in a literal
sense, of the fabric upon which the words of the testator
are written.    It will be sufficient if the legal force of the
instrument is divested or extinguished.    It is not important
what the form or character of the specific act is, provided it
be such as takes from the will all force and vitality.    The
paper is of little or no consequence, save as the medium of
preserving and expressing the purpose of the testator.    If
the signature of the maker of a promissory note was inten-
tionally and rightfully erased, no one would hesitate to de-
clare that the note was destroyed, although all else remained
intact.    If the grantor of a deed should intentionally erase
his signature, before an estate had vested thereunder, it is
clear that the instrument could not be treated as a deed, be-
cause the taking from it of an essential part would work its.
legal destruction.    It is, however, unnecessary to multiply
illustrations, for it is plain that the force of a writing may
be completely annulled by taking from it some essential and
indispensable element of vitality.

If we should adopt appellees' theory, we should be com-
pelled to construe the statute as limiting, rather than enlarg-
ing, the methods of revocation.    This we can not do without
violating a familiar rule of construction.    The language of
the present statute is more general and comprehensive than
that of the former.    Unlike the English statute, it contains
no restrictive or particularizing words.    The language is, no
will shall be revoked unless the testator "shall destroy, or
mutilate the same," and embraces all acts amounting to a.
mutilation or destruction, whether the acts are such as former

statutes or common law rules recognized as effective acts of revocation or not. Neither the term "destroy" nor the term "mutilate" should be given the narrow and restricted meaning for which appellee contends. "Mutilate" means something less than total destruction. Mere mutilation of a will would not, of itself, take from a will all legal force. A mutilation, however, which takes from the instrument an element essential to its validity, would have the effect to revoke it. To mutilate, in the sense in which it is generally used by law-writers and by judges, means to render imperfect. We often find courts speaking of "records mutilated by erasures," and "records mutilated by corrupt interlineations." Nor is the use of the word in this sense made by courts and writers of law books alone, for it is often used in the same sense by the authors of literary works. We often encounter such expressions as, "The works of the great Stagirite have come down to us in a mutilated condition;" "The commentator has sadly mutilated Quintilian." Webster, as illustrative of the meaning of the word, quotes from Addison the following : "Among the mutilated poets of antiquity, there is none whose fragments are so beautiful as those of Sappho." Worcester defines the word as follows : "To deprive of some essential part." Among the definitions given by Webster is the following : "To retrench, destroy, or remove a material part of, so as to render imperfect ; as, to mutilate the poems of Homer, or the orations of Cicero."

Purposely taking from a will the signature of the testator deprives it of an essential part, and makes it so imperfect as that it loses all legal force and effect. The manner in which the mutilation or destruction is effected is not of controlling importance. If the signature were cut or torn from the paper ; if all traces were removed by a chemical preparation there would be no room for controversy, it would plainly be a mutilation of the will. It can not be any the less a mutilation if the signature is marked out with pen, pencil or

other implement which erases, cancels or obliterates it.

We are referred to the following passage in a writer of acknowledged ability: "Where a pencil instead of a pen is used, the cancellation is not necessarily ineffectual, but is always *prima facie* considered deliberative, and it must be shown that it was intended to be final." 1 Jarman Wills, 5th Am. ed., 291. It appears in this case that the act was more than merely deliberative. The intention to revoke, and the cause from which the intention sprung, are shown by the fact that the testator's controlling purpose was to regain possession of the home farm. The final character of the act is revealed by the fact that part of the property upon which the will was designed to operate was sold, and that notes therein otherwise provided for were paid by the testator. The fact that the will was exhibited with the erasures upon it proves that deliberation was at an end. The design to revoke had been formed and executed.

The court erred in overruling the appellants' exceptions to the conclusions of law.

Cross errors are assigned which require us to determine the sufficiency of appellants' complaint. The appellees contend that the facts stated in the complaint do not show a revocation of the will. The allegations of the complaint upon this point are as follows: "And the plaintiffs allege that said Daniel Woodfill while in full life did revoke said will by obliterating his signature thereto, and by obliterating his name wherever it appeared in the attestation clause thereunder written, thereby mutilating said will with the full intent to revoke the same." If we are right in our conclusion, that divesting a will of the framer's signature is a mutilation, then we must adjudge the complaint sufficient. We do so adjudge.

Judgment reversed, with instructions to enter judgment upon the special finding in favor of appellants.