## COPE v. LYNCH ET AL.

[No. 19,382. Filed September 21, 1961. Rehearing denied November 6, 1961. Transfer denied February 1, 1962.]

*Lealand West,* of Scottsburg and *Richard M. Givan,* of Indianapolis, for appellant.

*Cooper, Cooper, Cooper & Cox, Eugene Cooper* and *Charles W. Cooper,* of Madison, for appellees.

MYERS, J.—This is an action brought by appellees as plaintiffs below against appellant, Carl Cope, and one Joseph Lawrence as defendants, to establish and probate a purported lost will and codicil of William A. Cope,

Deceased; for the revocation of letters of administration previously issued to appellant, Carl Cope, and for the granting of letters testamentary to Chester Lynch, husband of Daisy Lynch, one of the appellees herein, named as Executor in the purported lost will. The complaint alleged that an exact copy of the will and codicil had been found; that the will and codicil sought to be probated had been lost or were improperly destroyed or suppressed in a manner and time unknown to appellees during the lifetime of the testator, without his consent or knowledge and without the consent or knowledge of appellees.

The issues were formed by an answer filed by appellant, Carl Cope, pursuant to the provisions of Supreme Court Rule 1-3, wherein he denied specifically that the purported will and codicil were lost, improperly destroyed or suppressed.

A trial of the issues involved was had before the court without the intervention of a jury. After hearing evidence and taking the matter under advisement, judgment was entered for appellees on their complaint, the court finding that the will and codicil were lost or destroyed during the lifetime of the testator, but not at his instance or request. There was a specific finding that the testator did not intend to revoke his will and codicil. The copy of the will and codicil was ordered admitted to probate, and appellant, Carl Cope, was ordered to file a final accounting of his activities and to take no further actions in the estate except to file his final report and resignation. Chester Lynch was ordered appointed as Executor upon giving proper bond.

Appellant filed his motion for new trial, assigning as grounds therein that the decision of the court was not sustained by sufficient evidence and was contrary to law. A third assignment of error was later waived by

appellant. The motion was overruled and this appeal followed. Appellant assigns as error the overruling of the motion for new trial.

The evidence presented at the trial consisted of a stipulation, certain pre-trial examination, and the testimony of witnesses. It was stipulated that on June 21, 1956, William A. Cope duly executed his last will and testament at the office of his attorney, Lealand West of Scottsburg, Indiana; that the will offered in evidence was a carbon copy of an original which was not found following the death of the testator; that a codicil had been duly executed later in the year 1956; that Carl Cope, appellant herein, was the only surviving heir of the testator, being his son; that appellees, Daisy Lynch, June Sasser, Wendell Cope, Ray Cope, Herschel Cope, and Montana Bowman, were nephews and nieces; that appellee, Gary W. Cope, was a grandnephew; and that appellee, Joseph Lawrence, was a stepson.

From the pre-trial examinations and the testimony of witnesses, the evidence most favorable to appellees is as follows: William A. Cope, the testator, at the time of the events set forth herein, was a man about 77 years of age. He was married in 1905 or thereabouts. His wife had a son by a previous marriage, by the name of Joseph Lawrence, who grew up and lived with them. The Copes owned a farm near Scottsburg, Indiana, consisting of about 93 acres, on which was located their home. In 1954 Mrs. Cope died. After her death, William rented the farm and proceeded to visit the various members of his family at different times during the following years, usually returning to his home during the winters. Carl Cope, appellant herein, was the only surviving son which he had by his deceased wife.

For about four months of the summer and early fall of 1956, William visited with his niece, Daisy Lynch,

and her husband, Chester, at their home in Deputy, Indiana. It was while he was staying there that he went to Scottsburg and drew up and executed his will on June 21st. Upon leaving the attorney's office that day, he requested Daisy to read it and told her to put it away for safekeeping. This she did by taking it to her home and locking it in a secretary desk drawer. At the time, the will had been placed in a business envelope belonging to Lealand West, the attorney. His name was printed on the outside in the lefthand corner. When placed in the drawer, the envelope was not sealed.

By the terms of the will, Carl and Joseph Lawrence were to receive a portion of William's real estate, share and share alike. The residual estate was divided among the appellees herein, of which Carl and Joseph each were to receive a one-ninth share.

Some time later in the fall of 1956, the exact date being unknown, William drew a codicil to the will in his own handwriting. It was signed by him and witnessed by neighbors of the Lynches in Deputy. This was given to Daisy, who placed it in the envelope containing the will and again locked it in the drawer. The codicil altered the provisions of the will to the extent that all William's personal property was to be divided between Joseph and Carl, share and share alike.

Subsequently, William requested that the will and codicil be put in a safety deposit box. Daisy rented such a box at a bank in Madison, Indiana, and placed it therein. At the time this was done, William sealed the envelope and wrote on it, in the corner opposite Lealand West's name, the words "Will and Codicil."

Shortly thereafter, William went back to Scottsburg with his son, Carl. In January, 1957, he became sick and was taken to Richmond, Kentucky, where his niece, June Sasser, her husband, James, and their two children

lived. William's sister, being June's mother, also lived there. After a week or so there, he was stricken with a heart attack or "brain spasm," which necessitated hospitalization. He spent about ten days in the hospital and returned to the Sasser home in a weakened condition. He was bedridden most of the time, and apparently was suffering from heart trouble, hardening of the arteries, loss of appetite, and swelling of the legs. He was able to sit up in a "secretary" chair, with wheels on it, which members of the family pushed, so that he could get around in the house. He could get in and out of bed in order to go to a commode which was in his bedroom.

Some time in January, Daisy received a letter from June Sasser stating that William wanted his will and codicil and requesting that Daisy bring them to him. Daisy delivered the envelope containing them to him in Richmond on February 3, 1957, at which time he said that he wanted to make "a little change" in the will, but did not say what. The envelope was sealed when delivered to William. At the time, a larger envelope was obtained by James Sasser, who placed the sealed envelope therein together with a paper pertaining to insurance. James then wrote on the outside of the larger envelope: "Uncle Will's Junk." This larger envelope was not sealed. William placed the envelope in a satchel he owned, which contained other papers, canceled checks, binoculars, shotgun shells, and other odds and ends. The satchel was then placed on the floor of a closet in William's bedroom.

This room was about 10x12 feet in size. A three-quarter bed was located in one corner, which was occupied by William. Next to it was a bedside table. The closet was in the wall behind the head of the bed, and the door to it opened outward on the other side of the

bedside table. The doorknob was on the side nearest the bed. The depth of the closet was about two feet. When William was in bed, as he was most of the time, he could not reach the satchel where it was placed in the closet. At different times, William would have members of the family hand him the satchel as he was lying in bed and he would go through his possessions. Then the satchel would be placed back in the closet. There was testimony, including that of Carl, to the effect that William was never left alone; that some one was with him or near him at all times. He was able to get up and down from bed himself, but usually was helped by others. So far as any one knew, William never got the satchel from the closet by himself. June stated that he could not have done so because he was physically unable.

Carl came to visit the Sassers around the middle of February, 1957, and stayed about a week. He later returned on the 2nd of March and stayed there until after his father died on March 15th. When there, he occupied a bedroom in the basement. During his stay, Carl questioned members of the family about his father's will. At one time, he indicated to James Sasser that he thought he had been left out of the will and others were going to inherit the estate.

There was testimony that William had said the reason he was leaving his son, Carl, only a part of his estate was due to the fact that, no matter how much he gave him, Carl would use it up in drink. The stepson, Joseph Lawrence, stated that Carl was a "non-drinking alcoholic" and a member of Alcoholics Anonymous.

Prior to leaving the Lynch household in Deputy, Indiana, in the fall of 1956, William had made statements to Daisy and her husband, Chester, that they were not to let Carl get his hands on the will or he would tear it up.

June Sasser had occasion to see the envelope containing the will several times, the last being on March 2, 1957. She said that she had gone to the closet in William's bedroom to get some clothes, and noticed that it was lying outside the satchel. It was sealed and she could feel papers inside, but it was not in the larger envelope marked "Uncle Will's Junk." She said she stuffed it back in the satchel, which was on the floor.

After William had returned from the hospital at the end of January, his condition grew progressively worse, both physically and mentally. He lost his ability to speak clearly and did not seem to remember where he was. He slept most of the time. It was necessary to send him back to the hospital on March 7th and he died there on March 15th. After receiving his will from Daisy, he made no further request for it, although he periodically went through other papers in his satchel. However, just prior to going to the hospital the last time, he said, in effect, that it looked as if he was not going to be able to change his will, but what he had was better than none.

On March 15th, following William's death, the Sassers, together with Joseph Lawrence and Carl, went back to the house. Carl obtained the satchel from the closet and opened it in the presence of the others and poured the contents on the bed. He picked up the envelope which had originally contained the will and codicil. Some one remarked that it looked as if it had been opened and resealed. Carl opened it and it was discovered that the will and codicil were not in it. There was only a paper pertaining to some insurance. Carl remarked that, just as he had expected, his father had left no will. A few days later, after the funeral services had taken place, Carl showed to James Sasser and Joseph Lawrence a torn strip of paper which he had.

It was about two inches in width. On it, in a few lines, was typed the names of the appellees herein and each one's respective share of the estate. Upon being questioned about it, Carl stated that he had found it on the floor of his father's bedroom when Carl visited the Sassers in February. He said that he had not shown it to his father, or asked him anything about it, but folded it up and put it in his wallet. He said he thought it was of no importance and did not realize it might have been a torn part of the original will until after he had qualified as Administrator of the Estate. By that time, Carl said he had thrown away the scrap of paper.

During Carl's stay at the Sasser home, there was evidence of destruction of papers in his room. Bits of paper were observed on the floor by his bed. There was at least one time when Carl was present at the house when no other member of the family was there, William having gone into the hospital.

Upon direct examination, Carl flatly denied that he had destroyed or secreted his father's will or codicil. Joseph Lawrence testified that at one time before going to Richmond, Kentucky, William told him he was going to destroy the will he had made.

We have gone into detail and stressed the evidence in this case because both parties rely heavily in argument as to the facts which they claim lead to conclusions in their favor.

Appellant argues that appellees have the burden of proving the material facts alleged in their complaint; that, to sustain their cause of action, they must prove that the will had not been revoked by the testator, William, during his lifetime; that William retained possession and control of his will at all times; and when it was not found after his death a "presumption" arose that he revoked it in some manner.

Appellees contend that the evidence was sufficient to show a properly executed will and codicil, and, consequently, there is a presumption that the testator intended them to remain as such; that there is no positive evidence of revocation which would overcome the presumption of nonrevocation.

There is no question concerning the fact that William's will and codicil were properly executed and witnessed. There is clear proof of the terms and conditions of each as stipulated by the parties. The only question is whether William revoked them prior to his death.

It has been held that where a testator retains possession or control of his will and it is not found at or after his death, an "inference" arises that he destroyed it or mutilated it for the purpose of revoking it. *In Re Patton's Will* (1951), 121 Ind. App. 256, 95 N. E. 2d 311, 96 N. E. 2d 353. It is to be noted that the court in that case used the word "inference" and not "presumption." The distinction is important because it is for the jury or the court as a trier of facts to determine whether a permissible inference should be drawn. *Baltimore & Ohio R. Co.* v. *Reyher, Admx.* (1940), 216 Ind. 545, 24 N. E. 2d 284.

In this case the trial court rejected the inference urged by appellant and found in favor of appellees. This it had a right to do if there was sufficient evidence upon which to base a reasonable inference of probative value that the testator did not intentionally revoke his will and codicil. In cases involving the wrongful or fraudulent destruction of a will, there is never any direct evidence of such destruction, and if there was such at all, it must be reasonably inferred from the facts and surrounding circumstances presented at the trial.

Here, the revocation of a will and codicil in whole or in part is governed by statute, the pertinent section of which reads as follows:

"No will in writing, nor any part thereof, except as in this act provided, shall be revoked, unless the testator, or some other person in his presence and by his direction, with intent to revoke, shall destroy or mutilate the same; . . . ." Section 6-506, Burns' Ind. Stat., 1953 Replacement.

This statute must be strictly construed, and to effectuate a revocation thereunder, there must be an intention to revoke coupled with an act manifesting that intention. *Fletcher Trust Co.* v. *Morse* (1951), 230 Ind. 44, 101 N. E. 2d 658. This intention to revoke is a question of fact for the trial court to determine and must be as clear and unequivocal as the original intention to execute the will. *Est. of Granger* v. *Gosport Cem. Ass'n* (1954), 124 Ind. App. 686, 118 N. E. 2d 386, 119 N. E. 2d 437.

From the evidence revealed by the record in this case, the trial court could reasonably have inferred that William was too weak and physically infirm to have been in actual custody and control of his will. Although he placed the envelope containing the will and codicil in his satchel when it was delivered to him by Daisy early in February, 1957, there is no evidence that he ever handled it again or asked for it thereafter. June Sasser last saw the original envelope containing the will on March 2nd. Her husband testified as to William's condition at that time as follows:

"He was in bed practically all the time then. He didn't attempt to get up hardly for anything and he done quite a bit of sleeping or seemed to be sleeping. Whether he was alseep or not, I don't know."

The evidence was uncontradicted that whenever William went through his possessions, some one in the fam-

ily took the satchel out of the closet and replaced it when he was finished. These facts rebut the inference of revocation because of failure to find the will after death. The other facts presented certainly do not conclusively and clearly establish that he affirmatively mutilated or destroyed the will and codicil.

We find that there was sufficient evidence of probative value which warranted the trial court in reaching its decision. There were conflicting inferences here which were resolved by the court on the basis of the facts presented. This court cannot say that the evidence and reasonable inferences therefrom lead inescapably to the conclusion that judgment should have been in favor of appellant.

Judgment affirmed.

Ryan, P. J., and Ax and Cooper, JJ., concur.

NOTE.—Reported in 176 N. E. 2d 897.