JUDITH MARTS HEATH ET AL. *v.* DEBBIE STRUNK ET AL.

[No. 1271A280. Filed May 8, 1972.]

*William P. Foreman,* of Evansville, for appellants.

*Charles F. Cremer, Jr., William M. Evans,* of Indianapolis, *Waldo Hendrickson,* of Boonville, for appellees.

LOWDERMILK, J.—On October 5, 1969, Georgia M. Beeler died at the age of 75 years, a resident of Warrick County, Indiana. She was a widow, her husband, Carl, having predeceased her in 1964. The subject of this appeal is her will, which was proved and admitted to probate by the Warrick Circuit Court in the form of the executed carbon copy on October 15, 1969. The original will was found after the decedent's death. At some unknown time and by some unknown person it had been torn into more than six pieces.

Delmar Hodges qualified and was appointed executor of the will on October 15, 1969.

The decedent's sole heirs at law are Judith Marts Heath, Leona Marts Donald, and Mildred Marts Meyer, appellants

herein. They were nieces of the decedent, being descendants of the decedent's deceased brother, Herbert L. Marts. The defendants-appellees are beneficiaries under the will of the decedent and the defendant-appellee Delmar Hodges is also named therein as executor. Plaintiff-appellant Judith Marts Heath is also a beneficiary named in the will. Her specific bequest was shares of stock.

Trial was to the court without a jury. In trial plaintiffs-appellants contended that the will of the decedent, dated October 4, 1968, was revoked and that the lower court erred in probating a copy of said will and that such probate should be revoked and the appointment of the executor revoked. Plaintiffs-appellants further contend the original will was revoked by tearing and mutilation.

Prior to the commencement of the trial plaintiffs-appellants filed a written request for special findings of fact and conclusions of law thereon on March 31, 1971.

Mrs. Beeler had resided alone in her four room home in Boonville, Indiana, from and after her husband's death. Her estate consisted of the home and approximately $50,000 in cash and personal effects. She made some small bequests and devised the residue of her estate to her friend, Evelyn Howard, who had been her good friend for 20 years and for the last five years of decedent's life had been her constant companion, attending to her personal needs day after day.

The will in question was executed on October 4, 1968, nearly a year before the decedent's death. The attorney, in preparing the will, also prepared a carbon copy which was duly executed at the time of the execution of the original will. The executed carbon copy was left with her attorney and the original was taken with her, presumably to be kept at home.

On Monday, September 29, 1969, Mrs. Beeler became ill and was taken to St. Mary's Hospital in Evansville, where she remained bedfast until her death the following Sunday, October 5, 1969. During that period and while the decedent

was in the hospital the appellant, Judith Marts Heath, having a key, went to Mrs. Beeler's home several times. During the trial of the cause, in contesting the will, there was conflicting testimony as to the number of visits the appellant Heath made to the decedent's home and as to the dates and times of day on which these visits were made. One witness testified that the automobile of appellant Judith Marts Heath appeared at the decedent's home on each and every one of the evenings that the decedent was in the hospital and that the blinds in the house were pulled down during these evening visits but were re-opened upon her leaving the premises. There was also evidence that during a day time visit of appellant Heath to decedent's home while decedent was in the hospital the witness, who was concerned over the decedent's health and had noticed that someone was apparently in the home, entered the small four room house through an open back door and discovered that appellant Judith Marts Heath was going through things in the bedroom.

Between the time the decedent executed her will on October 4, 1968, and her death on October 5, 1969, there was no evidence in the record that anyone had seen her will; that during this time she did not consult with her attorney, Mr. Waldo Hendrickson. There was no evidence that decedent intended to revoke her will or that she or anyone in her presence or at her direction tore up the will.

Ten days after Mrs. Beeler's death appellant Judith Marts Heath and her mother, on October 15, 1969, went to the office of attorney Waldo Henrickson to see about her estate and while there told Mr. Hendrickson that the decedent did not have a will. They were contradicted by Mr. Hendrickson, who explained that he had an executed carbon copy of her will, which he produced, explained its provisions, and recommended they get in touch with Delmar Hodges, the named executor.

Later the appellant Heath, her mother, and the funeral director who conducted Mrs. Beeler's services and who had a

key to the decedent's home, all went to decedent's home. Appellant Heath told the funeral director she wanted to look for a will. All three went into the home and the funeral director went to the bedroom where he found in a desk drawer an envelope marked "WILL." This envelope so marked did contain a will that had been torn into several pieces.

This torn instrument and envelope marked "WILL" was delivered to attorney Hendrickson, who then caused the executed carbon copy thereof to be probated in the Warrick Circuit Court. Thereafter, on April 14, 1971, plaintiffs-appellants timely filed a will contest, alleging that the decedent had revoked her will. It is from the decision of the Warrick Circuit Court upholding the validity of the will that appellants have brought this appeal.

The special findings of fact and conclusions of law, together with the judgment thereon, are in the words and figures as follows, to-wit:

## "SPECIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

"The court, pursuant to the written request of the plaintiffs heretofore filed prior to the hearing and trial of this cause and prior to the admission of any evidence, now makes the following Special Findings of Fact and Conclusions of Law, to-wit:

## "SPECIAL FINDINGS OF FACT

"1. That Georgia M. Beeler died on October 5, 1969, domiciled in and a resident of Warrick County, State of Indiana, leaving an estate in said County and State.

"2. The decedent, Georgia M. Beeler, was a widow and unmarried at the time of her death and she was not survived by any descendents nor by either parent nor by any brother or sister. The decedent was survived only by her three nieces, the plaintiffs, Judith Marts Heath, Leona Marts Donald and Mildred Marts Meyer. Judith Marts Heath, Leona Marts Donald and Mildred Marts Meyer are daughters of Herbert L. Marts, the brother of Georgia M. Beeler. Herbert L. Marts predeceased Georgia M. Beeler. Judith Marts Heath is a natural child of Herbert L. Marts, de-

ceased. Leona Marts Donald and Mildred Marts Meyer were adopted as children and heirs at law of Herbert L. Marts on March 19, 1941, at which time the said Leona Marts Donald and Mildred Marts Meyer were minors.

"3. On October 4, 1968, the decedent, Georgia M. Beeler, at the office of Waldo Hendrickson, Attorney at Law, of Boonville, Indiana, executed an original ribbon copy and a carbon copy of her Last Will and Testament prepared for her by the said Waldo Hendrickson. On that date the original ribbon copy was delivered to and retained by the decedent. The executed carbon copy was retained by Mr. Hendrickson. Plaintiff's Exhibit No. 1 admitted in evidence in this cause is the executed carbon copy of said Last Will and Testament. Plaintiff's Exhibit No. 2 admitted in evidence in this cause is the original ribbon copy of said Last Will and Testament in the form in which it was delivered to and retained by the decedent except that the tearing thereof occurred after the document was delivered to the decedent.

"4. The decedent, Georgia M. Beeler, retained the possession of and control over the said original ribbon copy of her said Last Will and Testament continuously from and after the date of the execution of said will until she was taken to the hospital a week before her death.

"5. During the period of time from prior to October 4, 1968, until going to the hospital, the decedent, Georgia M. Beeler, resided alone in her four-room residence in the City of Boonville, Indiana.

"6. Judith Marts Heath and her mother, Alma Marts, arranged for the decedent, Georgia M. Beeler, to be admitted to the hospital and took charge of her house during her stay in the hospital, coming and going daily during the week before the decedent's death. Other including neighbors, were from time to time in the house. The plaintiff, Judith Marts Heath was in the room where the will was later found at least once during the week.

"7. After the death of the decedent, Georgia M. Beeler, the plaintiff, Judith Marts Heath, and her mother, Alma Marts, locked the house of the decedent, Georgia M. Beeler, and delivered the key to Mr. Charles Koehler, funeral director of Boonville, Indiana, who had conducted the funeral of the decedent.

"8. On October 15, 1969, the plaintiff, Judith Marts Heath, and her mother, Alma Marts, were informed by Waldo Hendrickson that he had prepared the October 4, 1968, will of the decedent, that the decedent had executed both

an original ribbon copy and a carbon copy, that he had delivered the original ribbon copy to the decedent and that he had in his possession the executed carbon copy. Thereupon, on the same date, the plaintiff Judith Marts Heath, her mother Alma Marts, and Mr. Charles Koehler, funeral director of Boonville, Indiana went to the home of the decedent for the purpose of attempting to find the original ribbon copy of said Last Will and Testament of the decedent.

"9. During the course of the search of the home of the decedent on October 15, 1969, by Judith Marts Heath, Alma Marts and Charles Koehler, Mr. Koehler found the original ribbon copy of the decedent's will (Plaintiffs' Exhibit No. 2) in an envelope in a drawer of a desk in the decedent's residence; and, when so found, said original ribbon copy of the decedent's will was torn and in the same condition in which the same was introduced in evidence in this cause and now exists, said condition being that all pages of said original ribbon copy are torn into six or more pieces.

"10. There is no evidence as to when the original ribbon copy of the will was torn, by whom it was torn, or for what purpose.

"11. On October 15, 1969, and during the course of the search of the residence of the decedent by Judith Marts Heath, Alma Marts and Charles Koehler, bank books, savings certificates and other similar valuable business papers and documents of the decedent were found in the same desk in which Plaintiffs' Exhibit No. 2 was found.

"12. Following the finding of Plaintiffs' Exhibit No. 2, the original torn, ribbon copy of the decedent's will, Judith Marts Heath, Alma Marts and Charles Koehler delivered Plaintiffs' Exhibit No. 2 and the other business papers of the decedent found at her home to the decedent's attorney, Waldo Hendrickson; and the said original torn, ribbon copy of decedent's will and said other papers of the decedent were retained by Mr. Hendrickson.

"13. During the early afternoon of October 15, 1969, the decedent's attorney, Waldo Hendrickson, presented the executed carbon copy of the decedent's will to this court for probate; and on the same date said executed carbon copy of the decedent's will (Plaintiffs' Exhibit No. 1) was admitted to probate in an ex parte proceeding in this court. During the course of the proceeding, the decedent's attorney, Mr. Hendrickson, displayed the torn, original ribbon copy of decedent's will to the court; but it was not offered for probate but retained by Mr. Hendrickson.

"14. The decedent, Georgia M. Beeler, did not consult her attorney, Mr. Hendrickson, at any time after October 4, 1968, the date of the execution of said Last Will and Testament.

"15. Delmar Hodges, named as Executor in the October 4, 1968, Last Will and Testament of the decedent, and all other persons beneficially interested therein and thereunder are parties to this proceeding.

"16. At all times since prior to October 4, 1968, until her death on October 5, 1969, the decedent, Georgia M. Beeler, was fully competent to make and execute or to revoke a Last Will and Testament.

## "CONCLUSIONS OF LAW

"Upon the foregoing facts the court concludes:

"1. The law is with the defendants.

"2. The plaintiffs, Judith Marts Heath, Leona Marts McDonald [sic] and Mildred Marts Meyer, are nieces of and the sole and only heirs at law of the decedent, Georgia M. Beeler.

"3. All necessary parties and parties to this proceeding and are represented herein by counsel, and the court has jurisdiction of the subject matter and all of the parties.

"4 The decedent, Georgia M. Beeler, during the entire period from prior to October 4, 1968, until her death on October 5, 1969, was in all respects fully competent to make and execute and to revoke a Last Will and Testament.

"5. The plaintiffs have failed to sustain the burden of proof that the Last Will and Testament of the decedent, Georgia M. Beeler, dated October 4, 1968, was revoked by the testatrix by her destruction and mutilation of the same with the intent to revoke the same.

"6. The decedent, Georgia M. Beeler, died testate and the will dated October 4, 1968 was properly probated and is the Last Will and Testament of the decedent, Georgia M. Beeler."

## "JUDGMENT ENTRY FOR AUGUST 5, 1971

"Comes now the respective parties by counsel and the Court having heretofore on the 31st day of March, 1971, heard evidence both oral and documentary in the above entitled cause without the intervention of a jury and having hereto-

fore at the written request of the Plaintiffs made the Court's special findings of fact and conclusion of law the same as attached hereto as supplement A to this judgment finding. "The Court having therefore made such findings of fact and conclusion of law, it is therefore considered and adjudged by the Court that the will of Georgia M. Beeler, deceased, as mentioned and set out in the complaint, is the Last Will and Testament of said testatrix Georgia M. Beeler, and that said will is valid and binding, and that the probate thereof be and remain as a probate of said will.

"IT IS THEREFORE CONSIDERED AND ADJUDGED by the Court that the Plaintiffs take nothing by their suit and that the Defendants recover of and from the Plaintiffs their costs in this action laid out and expended."

On September 28, 1971, plaintiffs-appellants filed their motion to correct errors together with a memorandum thereon.

The motion to correct errors is: (1) the decision of the court is contrary to the evidence; (2) and (3) are that the decision of the court is contrary to law as evidenced by the findings of facts made and entered by the court; (4) and (5) are that the court erred in its conclusions of law numbered 1, 5 and 6 and each of them, individually and respectively; (6) is that the court erred in its conclusion of law numbered 1, 5 and 6 which are contrary to the evidence and findings of facts, and groups these specifications and argues them as one, and we shall so treat them. All other claimed errors in the conclusions of law not having been argued are deemed waived by this court. Supreme Court Rules, Rule AP. 8.3(7).

Plaintiffs-appellants state in their "Statement of Facts and Grounds" that plaintiffs are not questioning or challenging the court's findings of facts. The plaintiff-appellants' position is that the court's conclusions of law numbered 1, 5 and 6 are contrary to law and contrary to the evidence and the findings of facts.

Plaintiffs-appellants further contend that "The court by its Finding No. 10 found that there is no evidence as to when the original ribbon copy of the will was torn, by whom it was torn, or for what purpose. It is clear, therefore that there

was no evidence to overcome the presumption of revocation. . . ." Plaintiffs-appellants further submit ". . . where there is no evidence to rebut the presumption, the presumption controls and the conclusions of law and judgment should be that the will was revoked and that the testatrix died intestate."

The court overruled the motion to correct errors and praecipe for the appeal was timely filed.

It is held by our Supreme Court in *Roberts, et al.* v. *Fisher* (1952), 230 Ind. 667, 105 N. E. 2d 595:

". . . The law is well settled that where a person executes several duplicate copies of a will, the destruction of one of the duplicates by the testator, or some other person in his presence and by his direction, *with intent to revoke,* causes all of the duplicate copies to be revoked. . . . To revoke a will in whole or in part, under § 7-301, Burns' 1933, it is necessary that there be a concurrence of two things, (1) the intention to revoke and (2) the act manifesting the intention by physical destruction or mutilation. [Citing cases.] The destruction of the ribbon copy and the mutilation of a duplicate copy by the testatrix destroyed the will, and makes it necessary to ascertain the intention of the testatrix in so doing—as to whether or not the will was revoked or whether it was revoked conditionally, bringing it within the doctrine of dependent relative revocation. The intention to revoke is a question of fact for the jury, or the trial court if there is no jury. . . . The physical act of destruction is itself equivocal, and may be deprived of all revoking efficacy by explainatory evidence, indicating the *animus revocandi* to be wanting."

The present statute on the manner of revoking a will is Burns 1953 Replacement, § 6-506:

"Manner of revocation-Republication.—No will in writing, nor any part thereof, except as in this act provided, shall be revoked, unless the testator, or some other person in his presence and by his direction, with intent to revoke, shall destroy or mutilate the same; or such testator shall execute other writing for that purpose, signed, subscribed and attested as required in section 503 [§6-503]. . . ."

The matter of revocation was discussed in *Tinsley* v. *Carwile* (1937), 212 Ind. 675, 10 N. E. 2d 597.

In *Tinsley*, the court found the will was duly executed and was kept in decedent's safety deposit box in a bank; and after decedent's death the box was opened. An envelope was lying on top of the other papers, upon the face of which was written "Will of Chas. H. Tinsley." There was written across the will the word "Void," and slightly above the first "Void" was another word, "Void." The will was typewritten upon two sheets of paper and two marks were drawn across the title of the will. Just below the title and diagonally across the first sheet of paper were two lines—one beginning at the upper right-hand corner and the other at the upper left-hand corner of the page and extending to the lower left-hand and lower right-hand corners. The diagonal lines were drawn in such manner as to intersect and cross each sentence contained on that page of the will. On the margin of the first page was the word "Void," beneath which were the initials "C.H.T."

Our Supreme Court, in *Tinsley*, discussed the English rule and our rule, and discussed the case of *Woodfill, et al.* v. *Patton, et al.* (1881), 76 Ind. 575, 40 Am. Rep. 269, and said that our present statute was more general and comprehensive than that of the former. Unlike the English, it contains no restrictive or particularizing words.

Our Supreme Court then held that the words "destroy" and "mutilate" embrace all the acts amounting to mutilation or destruction, whether they were such as the former statute or common law recognized as effective. In *Tinsley*, the Supreme Court quoted from *Woodfill, et al.* v. *Patton, et al.*, *supra*, as follows:

> ■ " 'Neither the term "destroy" nor the term "mutilate" should be given the narrow and restricted meaning for which appellee contends. "Mutilate" means something less than total destruction. Mere mutilation of a will could not, of itself, take from a will all legal force. A mutilation, however, which takes from the instrument an element essential to its validity, would have

the effect to revoke it. To mutilate, in the sense in which it is generally used by law-writers and by judges, means to render imperfect. . . .

". 'The manner in which the mutilation or destruction is effected is not of controlling importance.' "

Our Supreme Court, then, in comparing the *Woodfill* case to the facts in *Tinsley*, stated the conclusion was inescapable that Tinsley more effectively performed acts effectuating his intention to cancel his will than are shown in the *Woodfill* case. Tinsley's wife had died a short time before he drew the marks across his will and wrote the word "Void" thereon. He had no children and had a small estate. He had expressed his dissatisfaction with the will to his attorney after his wife's death. The court held further:

". . . When all the facts are considered it must be concluded upon sound reasoning that Charles H. Tinsley mutilated his will, and, since the trial court found that the acts performed by him were done with the intention of revoking the will, the conclusion is inevitable, upon the authority of *Woodfill et al.* v. *Patton et al., supra,* alone, that the will was and is effectively revoked."

In *Est. of Granger* v. *Gosport Cem. Ass'n* (1954), 124 Ind. App. 686, 118 N. E. 2d 386, the evidence disclosed that on September 22, 1945, the decedent executed the will in question in her attorney's office, took it with her, and at which time there was no ink or pencil marks thereon except for signatures. On December 10, 1945, an attorney prepared a codicil for her, which codicil she took with her from his office.

The decedent was removed from her home prior to her death, which occurred on February 21, 1953; within two or three days thereafter Clarence Baker, a neighbor and friend, found the instrument in question in decedent's home; the torn page (codicil) was removed, which instrument he delivered to the attorney preparing the will; that the decedent lived alone; that the Bakers, who were neighbors and close friends of the deceased, had no knowledge of relatives visiting

decedent; that the decedent had told Mr. Baker not much over a year prior to her death that she had a will. The will, when offered for probate, had ink or pencil markings thereon, some items contained diagonal lines, underlined lines, marginal marks, numbers before and after the word, "Item," re-numbering of certain items, the figure $200.00 written above $100.00 which was devised to the Gosport Cemetery; that the signatures of the decedent and attesting witnesses remained unchanged.

The question before the court was to decide whether the markings on the will constituted revocation thereof within the meaning of § 7-301, Burns 1933 Supplement.

The court, in *Granger*, said:

"... *The word mutilate, as used by the authorities of the state, has reference to something less than total destruction.*
...

"The requirements of the statute in reference to the revocation of wills must be strictly construed and whatever is done by testator to be effective as a revocation must be done with the intention of revoking the will. The act, without the intention, will not suffice. They must concur...." (Our emphasis.)

The court said further:

"*Such intention to revoke is a question of fact for the trial court to determine. Intent must be as clear and unequivocal as was the original intention to devise and bequeath.*
* * *
"Applying the general rule, this court cannot say that the evidence leads inescapably to the sole conclusion that the judgment should have been in favor of the appellants. There was sufficient evidence of probative value, parol and documentary, which warranted the trial court in reaching his decision. Reasonable men might have differed in their conclusions as to what was proved; therefore, judgment is affirmed." (Our emphasis.)

In the case of *In Re Patton's Will* (1950), 121 Ind. App. 256, 95 N. E. 2d 311, the trial court held that the will was not

shown to be *prima facia* the last will and testament of the decedent. Our court held that there was no error in the trial court's denying probate. Briefly, the facts are that Mr. Patton's will was offered for probate entirely in his own handwriting with the exception of the signatures of the attesting witnesses and was in the form commonly used in the drafting of wills. The writing covers the front and back page of a single sheet of paper of which parts were torn from the instrument in two places. Such tearing of the document eliminated his last name from the first paragraph of the will.

Part of what is apparently a devise of real estate is missing, while on the reverse side of the sheet item 12 reads:

" 'In Witness Whereof I. William O. Patton have here unto set my hand and seal this 21st day of October in the year of our lord nineteen hundred and twenty-four (1924)

( )"

The place where a testator's signature usually appears is torn from the instrument. A portion is torn out following the attestation clause and there are lines across the signatures of the attesting witnesses.

The offered will bears three notes on the margin, one in ink, "New Will 1944" and two in pencil, "Void a New Will" and "New Will/1944.", with these notations being in the handwriting of the decedent.

Our court, in passing on the *prima facia* validity of the will for probate as being the last will and testament of the decedent must first determine that there is a *prima facia* showing that the instrument is the last will and testament of the decedent.

In this case the instrument was mutilated and if done so by the testator or some other person in his presence and by his direction with intent to revoke, then a revocation was effected, as was said in *Tinsley* v. *Carwile, supra,* and *Woodfill, et al.* v. *Patton, et al., supra.*

"Where the testator retains possession or control of his will, and at or after his death it is not found, or is found thereafter among his effects in a mutilated or defaced condition, an inference arises that he destroyed or mutilated it for the purpose of revoking it. [Citing cases.] The court may also consider the marginal annotations made by decedent as bearing upon his intent. 57 Am. Jur., § 563, p. 385."

Plaintiffs-appellants' first specification in their motion to correct errors is that the decision of the trial court was contrary to law. Plaintiffs-appellants are appealing from a negative decision and, therefore, they have saved no question as a negative verdict or decision may not be attacked upon the ground that there is a lack of evidence to support it. The specification is inappropriate. *Est. of Granger* v. *Gosport Cemetery Ass'n, supra. Brennan* v. *Reydell* (1963), 134 Ind. App. 298, 187 N. E. 2d 492; *Hardy, et al.* v. *Town of New Harmony, Indiana, et al.* (1967), 248 Ind. 350, 227 N. E. 2d 689.

In the case of *Cope* v. *Lynch* (1961), 132 Ind. App. 673, 176 N. E. 2d 897, the plaintiffs-appellees brought an action against Carl Cope and Joseph Lawrence to establish and probate a purported lost will and codicil of William A. Cope; for the revocation of letters of administration previously issued to appellant, Carl Cope, and for the granting of letters testamentary to the executor named in the purported lost will. Appellant Carl Cope, son of decedent, appealed from an adverse judgment.

This case was tried by the court without a jury. After trial the court found that the will and codicil were lost or destroyed during the lifetime of the decedent, *but not at his instance or request*. There was a specific finding that the testator did not intend to revoke his will and codicil. The court having heretofore granted letters of administration to Carl Cope, appellant, ordered said Carl Cope to file a final accounting of his activities and to take no further action in the estate except to file his final report and resign. The court

then appointed the named executor upon giving of proper bond.

The parties stipulated that on June 21, 1956, William A. Cope duly executed his last will and testament in the office of his attorney, Lealand West, of Scottsburg, Indiana; that a carbon copy of the original was offered in evidence which carbon copy was found following the death of the testator; that a codicil had been duly executed in the year 1956; that Carl Cope, appellant, was the only surviving heir of the testator, being his son; that the appellees were nephews and nieces, a grand-nephew and a stepson.

The testimony most favorable to the appellees was that William A. Cope, the testator, was 77 years of age when he executed his will. He was married in 1905 or thereabouts and his wife had a son by a previous marriage, who grew up and lived with them.

Mrs. Cope died in 1954 and after her death the decedent herein rented his farm near Scottsburg, Indiana, and lived with various members of his family at different times during the following years, usually returning to his home during the winters.

For about four months in the summer or early fall of 1956 the decedent visited his niece, Daisy Lynch, and her husband, Chester, at their home in Deputy, Indiana. While there he went to Scottsburg and drew up and executed his will on June 21st. Upon leaving his attorney's office that day, he requested Daisy to read it and told her to put it away for safekeeping. This she did by taking it to her home and locking it in a secretary desk drawer. At the time, the will had been placed in a business envelope belonging to Lealand West, the attorney. His name was printed on the outside of the envelope in the lefthand corner. When placed in the drawer, the envelope was not sealed.

By the terms of the will, Carl and the stepson, Joseph Lawrence, were to receive a portion of the testator's estate, share and share alike. The residual estate was divided among the

appellees herein of which Carl and Joseph were to each receive a 1/9th share.

Sometime later in the fall of 1956, the exact date being unknown, William drew a codicil to the will in his own hand-writing. It was signed by him and witnessed by neighbors of the Lynches in Deputy. This was given to Daisy, who placed it in the envelope containing the will and again locked it in the drawer. The codicil altered the provisions of the will to the extent that all William's personal property was to be divided between Joseph and Carl, share and share alike.

Subsequently, William requested that the will and codicil be put in a safety deposit box. Daisy rented such a box at a bank in Madison, Indiana, and placed it therein. At the time this was done, William sealed the envelope and wrote on it, in the corner opposite Lealand West's name, the words "Will and Codicil."

Shortly thereafter William went back to Scottsburg with his son, Carl. In January, 1957, he became sick and was taken to Richmond, Kentucky, where his niece, June Sasser, her husband, James, and their two children lived. June's mother was William's sister and also lived there.

A week or so later he was stricken with illness which necessitated hospitalization for about ten days, after when he returned to the Sasser home in a weakened condition. He was bedridden most of the time and apparently was suffering from heart trouble, hardening of the arteries, loss of appetite, and swelling of the legs. He was able to sit up in a "secretary" chair with wheels on it, which members of the family pushed, so that he could get around in the house. He could get in and out of bed in order to go to a commode which was in his bedroom.

Sometime in January Daisy received a letter from June Sasser, stating that William wanted his will and codicil and requesting that Daisy bring them to him. Daisy delivered the envelope containing them to him in Richmond on February 3, 1957, at which time he said that he wanted to make "a

little change" in the will, but did not say what. The envelope was sealed when delivered to William. At the time, a larger envelope was obtained by James Sasser, who placed the sealed envelope therein together with a paper pertaining to insurance. James then wrote on the outside of the larger envelope: "Uncle Will's Junk." This larger envelope was not sealed. William placed the envelope in a satchel he owned, which contained other papers, canceled checks and divers articles. The satchel was then placed on the floor of a closet in William's bedroom. The bedroom was small, with not much furniture. When William was in bed, as he was most of the time, he could not reach the satchel where it was placed in the closet. At different times William would have members of the family hand him the satchel as he was lying in bed and he would go through his possessions. The satchel would then be placed back in the closet. There was testimony, including that of Carl, to the effect that William was never left alone, that someone was near him or with him all the time. He was able to get up and down from bed himself, but usually was helped by others. So far as anyone knew, William never got the satchel from the closet by himself. June stated that he could not have done so because he was physically unable.

Carl came to visit the Sassers around the middle of February, 1957, and stayed about a week, and later returned on the 2nd of March and stayed there until after his father died on March 15th. When there he occupied a bedroom in the basement and during the stay he questioned members of the family about his father's will. At one time he indicated to James Sasser that he thought he had been left out of the will and others were going to inherit the estate.

There was testimony that William had said the reason he was leaving his son, Carl, only a part of his estate was due to the fact that no matter how much he gave him, Carl would use it up in drink. There was further evidence that Carl was a "non-drinking alcoholic" and a member of Alcoholics Anonymous.

Prior to leaving the Lynch household in Deputy, Indiana, in the fall of 1956, William had made statements to Daisy and her husband, Chester, that they were not to let Carl get his hands on the will or he would tear it up.

June Sasser had occasion to see the envelope containing the will several times, the last being on March 2, 1957. She said that she had gone to the closet in William's bedroom to get some clothes, and noticed that it was lying outside the satchel. It was sealed and she could feel papers inside, but it was not in the larger envelope marked "Uncle Will's Junk." She said she placed it back in the satchel, which was on the floor.

After William had returned from the hospital at the end of January, his condition grew progressively worse, both physically and mentally. He could not speak clearly and did not seem to remember where he was. He slept most of the time. It was necessary to send him back to the hospital on March 7th and he died there on March 15th.

William made no request for his will after receiving it from Daisy, although he periodically went through other papers in the satchel. However, just prior to going to the hospital the last time, he said, in effect, that it looked as if he was not going to be able to change his will, but what he had was better than none.

After William's death the Sassers, Joseph Lawrence, and Carl went back to the house where Carl obtained the satchel from the closet. He opened it in the presence of the others and poured the contents on the bed. He picked up the envelope which had originally contained the will and codicil. Some one remarked that it looked as if it had been opened and resealed. Carl opened it and it was discovered that the will and codicil were not in it. There was only a paper pertaining to some insurance. Carl remarked that, just as he had expected, his father had left no will. A few day later Carl showed to James Sasser and Joseph Lawrence a torn strip of paper which he had. It was about two inches in width. On it, in a few lines, was typed the names of the appellees,

and each one's respective share of the estate. Upon being questioned about it, Carl stated that he had found it on the floor of his father's bedroom when Carl visited the Sassers in February. He said that he had not shown it to his father, or asked him anything about it, but folded it up and put it in his wallet. He said he thought it was of no importance and did not realize it might have been a torn part of the original will until after he had qualified as administrator of the estate. By that time, Carl said he had thrown away the scrap of paper.

*During Carl's stay at the Sasser home, there was evidence of destruction of papers in his room. Bits of paper were observed on the floor by his bed. There was at least one time when Carl was present at the house when no other member of the family was there, William having gone to the hospital.*

Upon direct examination, Carl flatly denied that he had destroyed or secreted his father's will or codicil. Joseph Lawrence testified that at one time before going to Richmond, Kentucky, William told him he was going to destroy the will he had made.

After setting out several details and long facts in this case we have come to the nub of the question:

"Appellant argues that appellees have the burden of proving the material facts alleged in their complaint; that, to sustain their cause of action, they must prove that the will had not been revoked by the testator, William, during his lifetime; that William retained possession and control of his will at all times; and when it was not found after his death a 'presumption' arose that he revoked it in some manner.

"Appellees contend that the evidence was sufficient to show a properly executed will and codicil, and, consequently, there is a presumption that the testator intended them to remain as such; that there is no positive evidence of revocation which would overcome the presumption of nonrevocation.

"There is no question concerning the fact that William's will and codicil were properly executed and witnessed. There is clear proof of the terms and conditions of each

as stipulated by the parties. *The only question is whether William revoked them prior to his death.*

"It has been held that where a testator retains possession of control of his will and it is not found at or after his death, an 'inference' arises that he destroyed it or mutilated it for the purpose of revoking it. *In Re Patton's Will* (1951), 121 Ind. App. 256, 95 N. E. 2d 311, 96 N. E. 2d 353. *It is to be noted that the court in that case used the word 'inference' and not 'presumption.' The distinction is important because it is for the jury or the court as a trier of facts to determine whether a permissible inference should be drawn. Baltimore & Ohio R. Co.* v. *Reyher, Admx.* (1940), 216 Ind. 545, 24 N. E. 2d 284.

"In this case the trial court rejected the inference urged by appellant and found in favor of appellees. This it had a right to do if there was sufficient evidence upon which to base a reasonable inference of probative value that the testator did not intentionally revoke his will and codicil. *In cases involving the wrongful or fraudulent destruction of a will, there is never any direct evidence of such destruction, and if there was such at all, it must be reasonably inferred from the facts and surrounding circumstances presented at the trial.*

\* \* \*

"From the evidence revealed by the record in this case, the trial court could reasonably have inferred that William was too weak and physically infirm to have been in actual custody and control of his will. Although he placed the envelope containing the will and codicil in his satchel when it was delivered to him by Daisy early in February, 1957, there is no evidence that he ever handled it again or asked for it thereafter. June Sasser last saw the original envelope containing the will on March 2nd. Her husband testified as to William's condition at that time as follows:

" 'He was in bed practically all the time then. He didn't attempt to get up hardly for anything and he done quite a bit of sleeping or seemed to be sleeping. Whether he was asleep or not, I don't know.'

"The evidence was uncontradicted that whenever William went through his possessions, some one in the family took the satchel out of the closet and replaced it when he was finished. *These facts rebut the inference of revocation because of failure to find the will after death. The other facts presented certainly do not conclusively and clearly establish that he affirmatively mutilated or destroyed the will and codicil.*" (Our emphasis.)

In this case the court found there were conflicting inferences which were resolved by the court on the basis of facts presented and which was sufficient evidence of probative value that the trial court was warranted in reaching the decision it did. The court said further:

". . . This court cannot say that the evidence and reasonable inferences therefrom lead inescapably to the conclusion that judgment should have been in favor of appellant."

There is a striking similarity between the *Cope* case and the case at bar; actions of relatives which would have benefited by the destruction of the will; and the will having been solely in the custody and control of the testator (testatrix) until the testator (testatrix) was removed from the home where the will was kept and taken to the hospital; soon after the removal to the hospital the testator (testatrix) died. In each of the cases there was strong evidence that there had been an attempt made to mutilate or destroy the will by a person who had access to the home and was in position to gain pecuniarily from the destruction of the will.

In the case at bar the evidence was uncontradicted that the decedent had exclusive and complete control of her will from the time of its preparation by her attorney and her properly and legally executing the same before and in the presence of two witnesses until six days before she died and those six days being the time she was confined to the hospital during her last illness. It was during these six days that Judith Marts Heath, plaintiff-appellant, entered decedent's home about every day, a part of which entrances were in the night time. Such night time entrances were noticeable by the fact that all window shades were drawn while she was in the four room house and were raised just prior to her leaving and locking the house.

There is further evidence by the neighbor who had befriended the decedent for many years and was interested in her, who, when she saw someone in the house, without knowl-

edge of their authority to be therein, went into the four room house through the open back door and saw and observed plaintiff-appellant, Heath, going through things in the bedroom.

There is nothing in the record that anyone other than Mrs. Heath had *authority* to enter decedent's home from the time decedent was taken to the hospital until after her death.

The decedent never mentioned revoking her will to her friends or neighbors or to her attorney.

The trial court determined by special finding number 4 that the decedent, Georgia M. Beeler, had retained the possession and control over the original ribbon copy of her last will and testament continuously from and after the date of its execution until she was taken to the hospital a week before her death.

The trial court further determined that Judith Marts Heath, plaintiff-appellant, and her mother, Alma Marts, had made the arrangements for the decedent to be taken to the hospital, and took charge of decedent's home during her stay in the hospital, coming and going daily during the week before the decedent's death. Others, including neighbors, went into the house from time to time. Plaintiff-appellant Judith Marts Heath was in the room where the will was later found at least once during the week.

There was no evidence as to when the original ribbon copy of the will was torn, by whom it was torn, or for what purpose.

And, further, the decedent, Georgia M. Beeler, was fully competent to make and execute or to revoke a last will and testament at all times since prior to October 4, 1968, until her death on October 5, 1969.

As we have heretofore said in this opinion, it was solely within the province of the trial court to hear the evidence

and to determine the credibility thereof. That it is not within our province to weigh the evidence is so well settled that it needs no citation of authority and we do not and shall not weigh the evidence in this cause.

The facts of this case may be compared with the facts in the case of *Cope* v. *Lynch, supra,* and more especially to the fact that in the *Cope* case the natural son of the decedent was alone in the home where the will was kept in a satchel under control of the decedent until such time he, the decedent, was taken to the hospital. It was during the son, Carl's, stay at the Sasser home there was evidence of destruction of papers in his room. Bits of paper were observed on the floor by his bed.

The evidence was uncontradicted that whenever William went through his possessions some one in the household took the satchel out of the closet and replaced it for him when he was finished. The court said these facts rebut the inference of revocation because of failure to find the will after the death.

The evidence is uncontradicted in the case at bar that the decedent had not made mention of destroying or revoking her will to any person and she was fully competent to make or revoke a will at all times prior to the removal from her home to the hospital where she died after six days.

The facts in this case, like in *Cope,* are such, in our opinion, that they rebut the inference of revocation because the ribbon copy of the will had had each page thereof torn into six parts and was then replaced in the envelope.

We find that there was sufficient evidence of probative value in the record before the trial court which warranted the trial court in reaching the decision it did in holding there was no revocation of the will of Georgia M. Beeler, deceased. There were conflicting inferences here which were resolved by the court on the basis of the facts presented. This court cannot say that under the evidence and reasonable inferences therefrom that reasonable men would inescapably come to the

same conclusion and that is that the judgment should have been in favor of the appellants.

Judgment affirmed.

Robertson, P.J. and Lybrook, J., concur.

NOTE.—Reported in 281 N. E. 2d 897.